# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA AND )
STATES OF COLORADO, FLORIDA, )
GEORGIA, ILLINOIS, TENNESSEE, )
and TEXAS )
)
ex rel. MARY COVINGTON, )
)
    Plaintiff-Relator, )  Case No. _____
) **JURY TRIAL DEMANDED**
v. ) **FILED UNDER SEAL**
)
GENEXE, LLC d/b/a GENEXE HEALTH;)
DAKOTA MALONE; CHAD CHAPPIE; )
GOLD RUSH INSTITUTE LLC; )
SILVER RUSH INSTITUTE LLC; )
IMMERGE, LLC a/k/a IMMERGE, INC.; )
PREVINTA HEALTH LLC d/b/a )
GENEXE HEALTH; BASE MEDICAL )
TESTING INC; BIOCONFIRM )
LABORATORIES, LLC; JASON GREEN; )
JASON GROSS; and JORDAN )
LANDSBERG, )
)
    Defendants. )

## COMPLAINT

1.    Relator Mary Covington brings this action on behalf of herself, the

United States of America, and the above named Plaintiff-States against

Defendants Genexe, LLC d/b/a Genexe Health; Dakota Malone; Chad

Chappie; Gold Rush Institute LLC; Silver Rush Institute LLC; IMMERGE,

LLC a/k/a IMMERGE, INC.; Previnta Health LLC d/b/a Genexe Health; Base

Medical Testing Inc; Bioconfirm Laboratories, LLC; Jason Green; Jason Gross; and Jordan Landsberg, for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*., and of the respective False Claims Acts of the above-named Plaintiff-States (collectively, the "False Claims Act").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and (b) and 28 U.S.C. §§ 1331, 1345.

3.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a), as Defendants transact business in this jurisdiction and violations of the False Claims Act described herein occurred in this district.

## GOVERNMENT HEALTHCARE PROGRAMS

4.      Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.,* establishes the Health Insurance for the Aged and Disabled Program, also known as Medicare. The United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS").

5.      The Medicare program is comprised of four parts. Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B covers medical services and equipment such as outpatient care, medical supplies, and

laboratory services. 42 U.S.C. §§ 1395j-w-5. Separate payments are made for each Current Procedures Terminology ("CPT") and Healthcare Common Procedure Coding System ("HCPCS") code listed on the Medicare Part B claims. *See* 45 C.F.R. §§ 162.1000, 162.1002, 162.1011, adopting the HCPCS as maintained and distributed by HHS, and the Current Procedural Terminology Coding Manual published by the American Medical Association (the "CPT Manual"). Medicare Part C, also known as Medicare Advantage, is a plan offered by private insurers that contract with Medicare to provide Part A and Part B benefits. 42 U.S.C. §§ 1395w-21-w-28. Medicare Part D is a plan offered by private insurers approved by Medicare to provide basic insurance for prescription drugs. 42 U.S.C. §§ 1395w-101-w-154.

6.      Reimbursement for Medicare Part A claims is made by the United States through CMS. Hospitals submit Medicare Part A claims directly to CMS, which in turn makes a standard, bundled payment based on a DRG diagnostic code.

7.      Reimbursement for Medicare Part B claims is made by the United States through CMS. CMS, in turn, contracts with fiscal intermediaries to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 421.5(b). Separate payments are made for each CPT

procedural code listed on the Medicare Part B claims. *See* 45 C.F.R. §§ 162.1000, 162.1002, 162.1011, adopting the Current Procedural Terminology Coding Manual published by the American Medical Association (the "CPT Manual").

8.    Reimbursement for Medicare Part C claims is made by the United States through CMS. CMS makes fixed monthly payments to each Medicare Choice organization for each enrolled individual, i.e., a capitated payment.

9.    Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* establishes the Medicaid program, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. Within broad federal rules, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures.

10.    TRICARE is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty (30) days or longer. The program is administered by the Department of Defense and funded by the federal government.

11.    The Federal Employees Health Benefits Program ("FEHBP") provides

healthcare benefits for qualified federal employees and their dependents. Under the FEHBP, the federal employee is covered by private payer health insurance which is in turn subsidized in part by the federal government.

12.    Medicare, Medicaid, and other insurance programs subsidized by the federal government are hereinafter collectively referred to as "Government Healthcare Programs."

## SERVICES MUST BE MEDICALLY NECESSARY AND PERFORMED ECONOMICALLY

13.    Reimbursement practices under all Government Healthcare Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic reimbursement requirement under Medicare, Medicaid, and other Government Healthcare Programs is that the service or item provided must be reasonable and medically necessary. *See, e.g.,* 42 U.S.C. § 1395y(a)(1)(A) (Medicare does not cover items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."); 42 C.F.R. §§ 411.15(k)(1), 411.406; *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) ("Although the standard of 'medical necessity' is not explicitly denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme.").

14.    Healthcare providers must certify that services or items ordered or provided to patients will be provided "economically and only when, and to the extent, medically necessary" and "will be of a quality which meets professionally recognized standards of health care" and "will be supported by evidence of medical necessity and quality." 42 U.S.C. § 1320c-5(a)(1)-(3).

15.    These requirements prohibit defendants from manipulating billing procedures in "an intentionally wasteful manner" that maximizes their own economic benefit while providing no patient benefit. *U.S. ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000). Thus, "while there is no requirement that the least costly alternative treatment be used," requests for payment become false when they are the result of "policies to artificially (i.e., unreasonably and unnecessarily) increase the quantity of items and amount of services provided to their patients without regard to medical necessity." *U.S. ex rel. Vainer v. Davita, Inc.*, 2012 WL 12832381, at *6 (N.D. Ga. Mar. 2, 2012).

16.    Providers who wish to be eligible to obtain Medicare reimbursement must certify, *inter alia*, that they agree to comply with the Medicare laws, regulations and program instructions that apply to them, and that they acknowledge, *inter alia*, that payment of claims by Medicare is conditioned upon the claim and the underlying transaction complying with all applicable

laws, regulations, and program instructions. *See, e.g.,* Form CMS-855A (for institutional providers); Form CMS-855S, at 24 (for certain suppliers); Form CMS-855I (for physicians and non-physician practitioners).

17.    Claims submitted by healthcare providers to Government Healthcare Programs contain similar representations and certifications. *See, e.g.*, Forms CMS-1500 (paper provider claim form used for Medicare, Medicaid, TRICARE, FEHBP, and OWCP); 837P (electronic version of form 1500); 1450 (UB04 – institutional provider paper claim form used for Medicare and Medicaid); 837I (electronic version of form 1450). When submitting a claim for payment, a provider does so subject to and under the terms of his certification to the United States that the services were delivered in accordance with federal law, including, for example, the relevant Government Healthcare Program laws and regulations. Government Healthcare Programs require compliance with these certifications as a material condition of payment, and claims that violate these certifications are false or fraudulent claims under the False Claims Act. CMS, its fiscal agents, and relevant State health agencies will not pay claims for medically unnecessary services or claims for services provided in violation of relevant state or federal laws.

## THE ANTI-KICKBACK STATUTE

18.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (the "AKS"),

prohibits any person or entity from making or accepting "any remuneration" to induce or reward any person for, *inter alia*, referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. § 1320a-7b(b). The statute's prohibition applies to both sides of an impermissible kickback relationship (i.e., the giver and the recipient of the kickback). By its terms, the statute prohibits kickbacks to those who themselves make referrals and purchases as well as those who recommend that others make referrals or purchases and those who arrange those referrals and purchases.

19.     Underscoring the breadth of the statutory definition, the HHS OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991), broadly define the term "remuneration" as "anything of value in any form or manner whatsoever." *See* HHS-OIG, OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 66 Fed. Reg. 23731, 23734 (May 5, 2003); *accord U.S. ex rel. Fry v. The Health Alliance of Greater Cincinnati*, 2008 WL 5282139, at *7 (S.D. Ohio Dec. 18, 2008).

20.     A violation of the Anti-Kickback Statute presumptively establishes a False Claims Act violation, including materiality. *See U.S. ex rel. McFarland v. Fla. Pharmacy Sols.,* 358 F. Supp. 3d 1316, 1326 (M.D. Fla. 2017) (quoting 42 U.S.C. § 1320a-7b(g)); *see also Guilfoile v. Shields,* 913 F.3d 178, 190 (1st

Cir. 2019); *U.S. ex rel. Lutz v. BlueWave Healthcare Consultants, Inc.,* 853 F.3d 131, 135 (4th Cir. 2017).

## MEDICARE COVERAGE OF GENETIC TESTING

21.    Except for certain statutory exceptions, Medicare does not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).

22.    Among the statutory exceptions Medicare covers are cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

23.    If diagnostic testing is necessary for the diagnosis or treatment of illness, Medicare further requires that all "diagnostic laboratory tests[] and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem…. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." 42 C.F.R. § 410.32(a).

24.    Cancer genomic testing (CGx) uses DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx is not a method of diagnosing whether an

individual presently has cancer.

25.    Because CGx does not diagnose cancer, Medicare only covers such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer.

26.    Medicare does not cover CGx for beneficiaries who have never had cancer or lack symptoms of cancer. *See* NCD90.2 (criteria for coverage of Next Generation Sequencing); LCD L36813 (BRCA 1 and BRCA 2 genetic testing, Wisconsin Physicians Service Insurance Corp.); LCD L36499 (same, First Coast Service Options, Inc.); LCD L36082 (same, Palmetto GBA).

27.    Pharmacogenomic testing (PGx) looks for changes or variants in genes that may determine whether a medication could be an effective treatment for a particular patient or whether they could have side effects to a specific medication.

28.    Medicare reimburses for testing of only two genotypes: CYP2C19 (CPT code 81225) and CYP2D6 (CPT code 81226).

29.    Medicare limits coverage of CYP2C19 testing to patients taking Plavix (used in persons with heart disease), and of CYP2D6 testing to patients on amitriptyline and/or nortriptyline, both antidepressants, and tetrabenzine, a medication used to treat Huntington disease. *See* LCD L36310 (Noridian),

L35698 (First Coast Service Options), L35332 (CGS Administrators), L35072 (Palmetto GBA), L36398 (Wisconsin Physicians Services Insurance Corp.).

30.     Lacking these indications, and a supporting ICD-10 code, Medicare will not reimburse for PGx.

## PARTIES

31.     Defendant Genexe, LLC d/b/a Genexe Health is or was a genetic screening services provider and/or marketer incorporated in Delaware but based in Colorado. It lists its principal office address as 36 South 18th Avenue, Suite D, Brighton, CO 80601, but it has operations throughout the country, including in St. Louis, Missouri.

32.     Defendant Dakota Malone is an owner and operator of Genexe, LLC.

33.     Defendant Previnta Health LLC d/b/a Genexe Health similarly is or was a genetic screening services provider and/or marketer incorporated in Florida but operating throughout the country.

34.     Defendant Jordan Landsberg is an owner and operator of Previnta Health LLC.

35.     Genexe, LLC and Previnta Health LLC are collectively hereinafter referred to as Genexe Health.

36.     At times relevant to this action, Genexe Health accepted Medicare, Medicaid, TRICARE, FEHBP, and some commercial insurances.

37.    Defendant Chad Chappie managed the St. Louis, Missouri office of Genexe Health that Ms. Covington worked at.

38.    Defendant Gold Rush Institute LLC ("Gold Rush") is a California corporation founded in June 2018. It listed its business address as Malone's apartment at 411 N 8th St. Unit 2402, St. Louis, MO 63101.

39.    Dakota Malone was an owner of Gold Rush.

40.    Chad Chappie was the registered agent for Gold Rush.

41.    Gold Rush was administratively dissolved in or about May 2019.

42.    Defendant Silver Rush Institute LLC ("Silver Rush") is a corporation founded in February 2019. Its principal office address is 1942 Broadway St., Ste. 314C, Boulder, CO 80302.

43.    Upon information and belief, Relator having been told this by Victoria Foster (VP of Genexe Health St. Louis branch) and Dakota Malone, Genexe was a part of Gold Rush, until Gold Rush dissolved and became Silver Rush.

44.    Upon information and belief, Relator having been told this by Victoria Foster, Gold Rush, and subsequently Silver Rush, performed the laboratory testing for samples acquired by Genexe Health.

45.    Defendant IMMERGE, LLC a/k/a IMMERGE, INC. ("Immerge") is a marketing company headquartered at 5600 S. Quebec Street, Suite B300, Greenwood Village, CO 80111.

46.    Immerge is owned and operated by Defendants Jason Green (Chairman and CEO) and Jason Gross (COO), who, upon information and belief, based on filings with the Colorado Secretary of State and Better Business Bureau (listing Gross as COO), were co-owners and operators of Genexe Health.

47.    Chappie and Landsberg were employees of Immerge contemporaneous with their employment with Genexe Health.

48.    Malone, Chappie, Landsberg, Green, and Gross all have backgrounds marketing solar power and telecommunications. Chappie has worked for Green and Gross—either through Immerge or its predecessor (2020 Companies)—from 2003 to 2019. Landsberg has worked for Green and Gross—either through Immerge or 2020 Companies—from 2006 to 2019. Upon information and belief, none of these individuals have any medical training or experience.

49.    Defendants Malone, Chappie, Landsberg, Green, Gross, Immerge, Genexe Health, Gold Rush, and Silver Rush, hereinafter collectively referred to as "Genexe," conspired to commit the healthcare fraud and violations of the False Claims Act described herein.

50.    Base Medical Laboratories Inc. ("Base Medical") is a North Carolina corporation operating out of Augusta, Georgia. It, like Genexe, marketed genetic lab testing.

51. Bioconfirm Laboratories, LLC is a genetic testing laboratory in Doraville, Georgia.

52. Upon information and belief, Bioconfirm Laboratories, LLC performed and billed for the testing on Base Medical's samples.

53. Relator Mary Covington was contracted to be a marketer/technician for Genexe Health and/or Gold Rush in the St. Louis area, one of about 10-12 total marketers in that office (the "marketers"), of hundreds contracting with Genexe Health around the country. She worked for Genexe Health and/or Gold Rush, and subsequently Silver Rush, from March 2019 until about July 2019. From about July 2019 to August 2019, Ms. Covington contracted to be a marketer/technician for Base Medical.

54. Victoria Foster and Lynda Harper were Vice Presidents of the St. Louis office. Foster was Ms. Covington's lead supervisor.

55. Ms. Covington has personal knowledge of Genexe Health operating in Illinois (having worked in Illinois herself, including recruiting Illinois Medicaid beneficiaries); Colorado (through coworker Mark Blanchard); Omaha, Nebraska; Springfield and Kansas City, Missouri; and Tennessee (from Foster and other marketers).

56. Ms. Covington is also aware of Genexe recruiting marketers and/or marketing lab testing in Alabama, California, Florida, Georgia, Kentucky,

Idaho, Nevada, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, and Texas.

## FACTUAL ALLEGATIONS

*Genexe Recruited Individuals for Medically Unnecessary and Fake Genetic Testing*

57. Relator Mary Covington was hired by Genexe Health/Gold Rush in March 2019 to be a genetic screening technician.

58. Her job consisted primarily of marketing genetic testing to senior citizens.

59. Ms. Covington attended Genexe marketer training over two or three days that was conducted by Victoria Foster and supervised by Dakota Malone.

60. Genexe encouraged the marketers to set up tables as a street vendor at events and locations that would see a lot of senior citizens, such as grocery stores and churches.

61. Sometimes Foster would donate money to a church, and in return the church would allow the marketers to set up a table at one of its events.

62. Genexe told the marketers to wear scrubs or lab coats so that they looked like medical professionals.

63.    Genexe trained the marketers to call people over to the table and ask whether they had any history of cancer in the family. If the individual said no, the marketers were taught to ask more generic questions to get to a "yes", like whether anyone in their family "had something wrong with their stomach," which "could be pancreatic cancer."

64.    If individuals would not give them information sufficient to warrant CGx or they declined CGx, the marketers were told to ask what medications they were taking. If the individual was taking three or more medications, the marketers were trained to sell them on PGx instead.

65.    Once they had their first yes, the marketers would ask who was their insurer, to determine whether their insurance would cover the genetic testing services.

66.    If the individual's insurance covered the service, it was next the marketers' job to get the individual to agree to genetic testing, whether it be CGx, PGx, or sometimes both.

67.    Upon information and belief, some individuals were given genetic testing for inherited heart disease or cholesterol.

68.    At first, Genexe encouraged the marketers to purchase $5 and $10 gift cards to offer to individuals for agreeing to testing, but at some point in the summer of 2019, Genexe told the marketers to stop doing this.

69.    Offers of gift cards or other gifts to beneficiaries in exchange for their agreement to have laboratory services performed and billed under their plans are violations of the Anti-Kickback Statute.

70.    Genexe taught the marketers a number of tactics to convince individuals to agree to genetic testing. For example, the marketers would tell the individuals that their insurance would cover the testing, and that there was no copayment because they were contracted through Medicare to provide genetic testing as a preventative health service. They would encourage the individuals to agree to CGx for their and their family's benefit. They would even say that the testing could identify specific organs that were predisposed to cancer.

71.    If the marketers were trying to convince the individuals to agree to PGx, they were trained to explain that some medications have ill effects or may not work properly, depending on their genetics.

72.    Foster—who would sometimes go out with the marketers—would even tell people that their medications may cause more harm than good and could cause cancer.

73.    Once an individual agreed to testing, the marketers would then read through a questionnaire and enter the responses in their tablets.

74.    At the conclusion of the questionnaire, the marketers would have the individuals swab themselves and seal the swab in a tube with their first initial, last name, and birthday.

75.    As the final step, the marketers would call a 1-800 number and speak to a telehealth provider. They would hand the phone to the individual, who would speak to the provider. When the phone was handed back, the provider would say it was okay to perform the test and would give them an authorization number to put on the bag with the sealed swab.

76.    The marketers would tell the individuals to expect their results in 4-6 weeks and give them a card with a customer service number to call if they did not receive the results.

77.    As these were friends and neighbors, who Ms. Covington would see time and again at the grocery store or church, she sometimes even gave them her personal cell phone number and told them to call her if they did not get their results.

78.    At the end of the day, Foster would pick up the swabs and supposedly FedEx them to Gold Rush, or subsequently Silver Rush. Ms. Covington accompanied Foster to the FedEx facility on some occasions.

*The Genetic Testing was Not Actually Performed*

79.    All seemed well for the first few months, as Ms. Covington thought she was providing a helpful service to her community.

80.    Then, the individuals started calling. In fact, a lot of them did, or they would see her at the tables and complain about not having received their test results.

81.    When they called the number on the card for customer service, they were routinely told that their testing had just been completed and to expect their results in the next few weeks, but they never came.

82.    Moreover, some individuals were starting to get billed. For example, a nun had to pay about $1,000 for her testing because her benefits had been exhausted. (Genexe also accepted the health insurance plan for the Archdiocese of St. Louis.)

83.    Thus, not only did Genexe submit or cause to be submitted claims for reimbursement that were not medically necessary, but it also submitted or caused to be submitted claims for tests that were not performed and/or the results given to the individual.

84.    Moreover, upon information and belief, Genexe made, used, or caused to be made to used false records to support medical necessity, including but not limited to as false records of false diagnoses.

*Genexe also Caused False Claims to be Submitted for Alzheimer's, Dementia, and Parkinson's Testing*

85.    Although the bulk of Genexe's samples were CGx and PGx, it also billed for and allegedly performed medically unnecessary Alzheimer's, Dementia, and Parkinson's (ADP) testing.

86.    Foster told the marketers that after 30 days (and so before the individuals realized they would not be getting their test results), they should call the individuals who previously agreed to CGx or PGx and ask them the ADP questions. If they answered yes to enough questions about family history of Alzheimer's, Parkinson's, or dementia, the Genexe marketers would tell them that Genexe could perform a genetic test to determine if they were genetically predisposed to the disease.

87.    If the individual agreed, the marketer would have to meet with them again in person and obtain a swab.

88.    Neither the individual nor the marketer spoke to a telehealth provider for authorization for the ADP test.

89.    When Victoria Foster was working the tables and recruiting CGx and PGx clients of her own, she would sometimes get a second swab from that same client. She would put that swab into a bag marked "male" or "female", which Ms. Covington understood was so that Foster could later run an ADP

test, but she did not label it with any identifying information. Thus, even if Foster contacted someone and got their permission, upon information and belief, she simply submitted a random swab from the proper gender and did not obtain a swab from that person.

90.    Upon information and belief, like the PGx and CGx, Genexe submitted or caused to be submitted claims for ADP testing that was not actually performed and/or which results were not provided to the individuals.

91.    Even if the ADP tests were actually performed, they would not be covered because they were not medically necessary or for use in the individuals' treatment.

92.    Attached hereto as Exhibit A is a list of individuals recruited for genetic testing by the marketers on behalf of Genexe Health including, when known, initials of the marketer who referred them;[1] the dates of the intake and shipping to the laboratory; what test they were signed up for; and insurance type. Relator has can include identifying information such as names and birthdates *in camera*.

93.    Moreover, Patients 1-48 on Exhibit A were subsequently contacted by Genexe Health about ADP testing.

---

[1] DM stands for Defendant Dakota Malone.

94.     Genexe obtained a second swab for ADP testing from Patients 46 (a Medicare beneficiary) and 47.

*Genexe Health is Replaced by Base Medical Testing Inc.*

95.     In or about June or July 2019, Foster informed the marketers that Genexe Health had dissolved.

96.     Later, in a meeting with the marketers, Chappie explained that they just needed to find a new laboratory to run the tests and they could continue to recruit genetic testing referrals as they always had.

97.     Upon information and belief, Chappie, always the salesman, was looking for a new organization with whom to engage in the same fraud as he had with Genexe Health.

98.     Ms. Covington and the other marketers went through online training for a number of companies before Chappie seemingly settled on a company called Base Medical Testing Inc. in or about late July 2019.

99.     It was around this same time that Base Medical's owner, Daniel Abshari, was arrested. Abshari was later indicted for Medicare fraud under a similar set of facts as those alleged herein.

100.    Attached hereto as Exhibit B is a list of individuals recruited for genetic testing by the marketers on behalf of Base Medical including, when known, initials of the marketer who referred them; the dates of the intake

and shipping to the laboratory; what test they were signed up for; and insurance type. Relator has can include identifying information such as names and birthdates *in camera*.

<u>*Kickbacks to 1099 Marketers*</u>

101.   The Genexe St. Louis office had weekly meetings with the managers and technicians.

102.   At first, they met at Dakota Malone's loft apartment in St. Louis. Later, Genexe rented coworking space in St. Louis.

103.   The marketers were 1099 contractors.

104.   Gold Rush / Silver Rush paid the St. Louis marketers $100 per CGx or PGx referral they obtained, or for every two ADP test referrals they obtained, on behalf of Genexe Health.

105.   Usually, the St. Louis marketers were given a quota of 15 samples per week.

106.   However, it was not unusual for the St. Louis marketers to receive a call from Victoria Foster near the end of the day, who would offer a $50 or $100 bonus if they could get one or two more referrals before the end of the day.

107.   At the last meeting Ms. Covington attended, Chappie offered $1,000 to anyone who could get 10 swabs that week.

108.   Moreover, if the St. Louis marketers met their 15-sample quota, they could "spin the wheel" at the weekly meeting. This was literally a wheel in Chappie's office that had various bonus amounts on it.

109.   One marketer who worked in rural areas of Jefferson County spun the wheel nearly every week and was once paid a bonus of $1,000.

110.   At these meetings, managers would encourage the marketers to get more referrals the following week, emphasizing the remuneration.

111.   For example, on one occasion, Chappie pointed at Ms. Covington and loudly said, "Mary Covington, how would you like to make **one thousand dollars a week?**"

112.   Volume-based offers of remuneration to 1099 marketers in exchange for lab testing referrals is a violation of the Anti-Kickback Statute or EKRA. *See also* OIG Advisory Opinion No. 99-3.

113.   A number of courts have held that similar marketing agreements are illegal under the Anti-Kickback Statute. *See, e.g., Nursing Home Consultants, Inc. v. Quantum Health Services, Inc.*, 926 F. Supp. 835 (E.D. Ark. 1996); *Zimmer, Inc. v. Nu Tech Med., Inc.*, 54 F. Supp. 2d 850 (N.D. Ind. 1999). Most recently, the Government took this position in a case where independent marketers obtained prescriptions for a compound drug pharmacy. *U.S. ex rel.*

*Thornton v. Nat'l Compounding Co.*, 2019 U.S. Dist. LEXIS 109493 (M.D. Fla. July 1, 2019).

## COUNT I
## VIOLATIONS OF 31 U.S.C. § 3729 – FEDERAL FALSE CLAIMS ACT

114.   Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

115.   As set forth above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

116.   As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

117.   As set forth above, Defendants knowingly conspired to commit violations of the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(C).

118.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. 31 U.S.C. § 3729.

119.   Relator is entitled to reasonable attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

## COUNT II
## VIOLATIONS OF COLORADO REVISED STATUTE § 25.5-4-305 - COLORADO MEDICAID FALSE CLAIMS ACT

120.   Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

121.   As set forth above, Defendants knowingly presented or caused to be presented to the Colorado Medicaid program false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(a).

122.   As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(b).

123.   Due to Defendants' conduct, the State of Colorado has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim, record, or statement. Colo. Rev. Stat. § 25.5-4-305(1).

124.   Relator is entitled to reasonable attorneys' fees, costs, and expenses. Ga. Code Ann. § 49-4-168.2(i).

## COUNT III
## VIOLATIONS OF FLORIDA STATUTE § 68.082 – FLORIDA FALSE CLAIMS ACT

125.   Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

126.   As set forth above, Defendants knowingly presented or caused to be presented to the Florida Medicaid program false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

127.   As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of Fla. Stat. § 68.082(2)(b).

128.   As set forth above, Defendants conspired to commit a violation of the Florida False Claims Act, in violation of Fla. Stat. § 68.082(2)(c).

129.   Due to Defendants' conduct, the State of Florida has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim, record, or statement. Fla. Stat. § 68.082(2).

130.   Relator is entitled to reasonable attorneys' fees, costs, and expenses pursuant to Fla. Stat. § 68.085.

## COUNT IV
## VIOLATIONS OF O.C.G.A. § 49-4-168.1 - GEORGIA FALSE MEDICAID CLAIMS ACT

131.   Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

132.   As set forth above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of O.C.G.A. § 49-4-168.1(a)(1).

133.   As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of O.C.G.A. § 49-4-168.1(a)(2).

134.   As set forth above, Defendants conspired to commit a violation of the Georgia False Medicaid Claims Act, in violation of O.C.G.A. § 49-4-168.1(a)(3).

135.   Due to Defendants' conduct, the State of Georgia has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim, record, or statement. O.C.G.A. § 49-4-168.1.

136.   Relator is entitled to reasonable attorneys' fees, costs, and expenses pursuant to O.C.G.A. § 49-4-168.2(i).

## COUNT V
## VIOLATIONS OF 740 ILLINOIS COMPILED STATUTES § 175/3 – ILLINOIS FALSE CLAIMS ACT

137.   Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

138.   As set forth above, Defendants knowingly presented or caused to be presented to the Illinois Medicaid program false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1)(A).

139.   As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of Ill. Comp. Stat. § 175/3(a)(1)(B).

140.   Due to Defendants' conduct, the State of Illinois has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim, record, or statement. Ill. Comp. Stat. § 175/3(a)(1).

141.   Relator is entitled to reasonable attorneys' fees, costs, and expenses pursuant to Ill. Comp. Stat. § 175/4(d)(1).

### COUNT VI
### VIOLATIONS OF TENNESSEE CODE ANNOTATED § 71-5-182 – TENNESSEE MEDICAID FALSE CLAIMS ACT

142.   Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

143.   As set forth above, Defendants knowingly presented or caused to be presented to the Tennessee Medicaid program false or fraudulent claims for payment or approval, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

144.   As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false claims, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

145.   As set forth above, Defendants conspired to commit a violation of the Tennessee Medicaid False Claims Act, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(C).

146.   Due to Defendants' conduct, the State of Tennessee has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim, record, or statement. Tenn. Code Ann. § 71-5-182(a).

147.   Relator is entitled to reasonable attorneys' fees, costs, and expenses pursuant to Tenn. Code Ann. § 71-5-183(d).

## <u>COUNT VII</u>
## VIOLATIONS OF TEXAS CODE § 36.002 – TEXAS MEDICAID FRAUD PREVENTION ACT

148.   Relator hereby incorporates and realleges herein all other paragraphs as if fully set forth herein.

149.   As set forth above, Defendants knowingly made or caused to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not

authorized or that is greater than the benefit or payment that is authorized, in violation of Tex. Code § 36.002(1).

150.   As set forth above, Defendants knowingly concealed or failed to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, in violation of Tex. Code § 36.002(2).

151.   As set forth above, Defendants knowingly made, caused to be made, induced, or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program, in violation of Tex. Code § 36.002(4)(B).

152.   As set forth above, except as authorized under the Medicaid program, Defendants knowingly paid, charged, solicited, accepted, or received, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program, in violation of Tex. Code § 36.002(5).

153.   As set forth above, Defendants knowingly made or caused to be made a claim under the Medicaid program for a service or product that has not been

approved or acquiesced in by a treating physician or health care practitioner, in violation of Tex. Code § 36.002(7)(A).

154.   As set forth above, Defendants knowingly made or caused to be made a claim under the Medicaid program for a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry, in violation of Tex. Code § 36.002(7)(B).

155.   As set forth above, Defendants conspired to commit a violation of the Texas Medicaid Fraud Prevention, in violation of Tex. Code § 36.002(9).

156.   As set forth above, Defendants knowingly made, used, or caused the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, in violation of Tex. Code § 36.002(12).

157.   As set forth above, Defendants knowingly engaged in conduct that constitutes a violation of Tex. Code § 32.039(b), thus also violating Tex. Code. § 36.002(13).

158.   The State of Texas is entitled to three times the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act,

including any payment made to a third party. Tex. Code §§ 36.052(a)(1) and 36.052(a)(4).

159.   The State of Texas is entitled to prejudgment interest on the amount of the payment or the value of the benefit described in the above paragraph at the prejudgment interest rate in effect on the day the payment or benefit was received or paid, for the period from the date the benefit was received or paid to the date that the state recovers the amount of the payment or value of the benefit.

160.   The State of Texas is entitled to a civil penalty as required by Tex. Code § 36.052(a)(3)(B) for each unlawful act committed by Defendants.

161.   Relator is entitled to reasonable attorneys' fees, costs, and expenses pursuant to Tex. Code § 36.110.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator prays for judgment against Defendants:

(a) awarding the United States and the Plaintiff-States treble damages sustained by them for each of the false claims;

(b) awarding the State of Texas three times the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of

the unlawful act, including any payment made to a third party, plus interest;

(c) awarding the United States and the Plaintiff-States the maximum civil penalty for each of the false claims, records, statements, and unlawful acts;

(d) awarding Relator the maximum share of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(e) awarding Relator litigation costs, expenses, and reasonable attorneys' fees;

(f) granting such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby respectfully demands trial by jury on all issues and counts triable as of right before a jury.

Respectfully submitted,

Jason Marcus
Georgia Bar No. 949698
**Bracker & Marcus LLC**
3225 Shallowford Road, Suite 1120
Marietta, Georgia 30062
Telephone: (770) 988-5035
Facsimile: (678) 648-5544
Jason@fcacounsel.com